923 P.2d 916

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**David TIMAS, also known as "Jay", Defendant–Appellant,**

**and**

**Louise M. Nelson, also known as "Louise", Archie Grant III, also known as "Archie", Francis Y. Mori, also known as "Mark", Vicki L. Himmelmann, also known as "Vicky", and Gregory King, also known as "Baby G", Defendants.**

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Francis Y. MORI, also known as "Mark", Defendant–Appellant,**

**and**

**David Timas, also known as "Jay", Louise M. Nelson, also known as "Louise", Archie Grant III, also known as "Archie", Vicki L. Himmelmann, also known as "Vicky", and Gregory King, also known as "Baby G", Defendants.**

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Archie GRANT, III, also known as "Archie", Defendant–Appellant,**

**and**

**David Timas, also known as "Jay," Louise M. Nelson, also known as "Louise", Francis Y. Mori, also known as "Mark", Vicki L. Himmelmann, also known as "Vicky", and Gregory King, also known as "Baby G", Defendants.**

**Nos. 16262, 16270 and 16363.**

Intermediate Court of Appeals of Hawai'i.

Feb. 27, 1996.

As Amended March 1, 1996.

Certiorari Denied (Timas) March 18, 1996.

Certiorari Granted (Mori) March 18, 1996.

Certiorari Dismissed (Mori) Sept. 23, 1996.

As Amended Oct. 4, 1996.

Dwight C.H. Lum, Honolulu, for defendant-appellant David Timas.

Lila B. Kanae (Kali Watson, on the brief), Honolulu, for defendant-appellant Francis Y. Mori.

Matthew A. Horn, on the brief, Honolulu, for defendant-appellant Archie Grant, III.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

BURNS, Chief Judge.

Defendants were charged with Promoting a Dangerous Drug in the First Degree, Hawai'i Revised Statutes (HRS) § 712–1241(1)(b)(ii)(A) (1993),[1,2,3] by distributing cocaine. On May 7, 1992 a First Circuit Court jury found defendant David Timas (Timas)

---

1. Hawai'i Revised Statutes (HRS) § 712–1241 (Supp.1992) in relevant part provides:

 (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

 \* \* \* \* \* \*

 (b) Distributes:

 \* \* \* \* \* \*

 (ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

 (A) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, ...

 \* \* \* \* \* \*

 (2) Promoting a dangerous drug in the first degree is a class A felony.

2. HRS § 712–1240 (1993) states in relevant part that "'[t]o distribute' means to sell, transfer, prescribe, give, or deliver to another, or to leave, barter, or exchange with another, or to offer or agree to do the same."

3. The jury instructions were read to the jury and, at the jury's request, a copy of the instructions was provided to the jury. The instructions stated in relevant part as follows:

 A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the ofesne [sic]. The prosecution must prove accomplice liability beyond a reasonable doubt.

 A person is an accomplice of another in the commission of an offense if:

 With the intent to promote, facilitate the commission of the offense, he:

 a. solicits the other person to commit it; or

 b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.

 Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

guilty of six counts, defendant Francis Y. Mori (Mori) guilty of two counts, and defendant Archie Grant III (Grant) guilty of one count. Timas, Mori, and Grant appealed.

█ Grant died on July 4, 1995. *State v. Makaila*, 79 Hawai'i 40, 45, 897 P.2d 967, 972 (1995), authorizes us, in our discretion, to "either (1) dismiss the appeal as moot, vacate the original judgment of conviction, and dismiss all related criminal proceedings, or, in the alternative, (2) enter such other order as the appellate court deems appropriate pursuant to HRAP [Hawai'i Rules of Appellate Procedure] Rule 43(a)." We have been informed by the attorney who represented Grant in this appeal prior to Grant's death that none of Grant's next-of-kin desire to continue Grant's appeal. Therefore, we opt for choice one.

We refer to Timas and Mori, collectively, as Defendants. Mori appeals the June 15, 1992 Judgment sentencing him to two concurrent terms of incarceration for twenty years. Timas appeals the July 6, 1992 Judgment sentencing him to six concurrent terms of incarceration for twenty years. We vacate the June 15, 1992 Judgment convicting Mori. We affirm the July 6, 1992 Judgment convicting Timas.

### FACTS

In each of the transactions described below, undercover Honolulu Police Department Officer Elario Tehada (Officer Tehada) sought to purchase "two eightballs" of cocaine. An "eightball" is one-eighth of an ounce.

On April 3, 1991 Officer Tehada telephoned Timas and arranged a meeting to purchase drugs. Upon meeting Timas at Kapi'olani Park, Officer Tehada followed Timas' car to a parking lot (the Lot) on Hoawa Street and Kapi'olani Boulevard. Timas, Danielle Tucker (Tucker), Louise Nelson (Nelson), and a man identified as "Sonny" were in Timas' car. Officer Tehada gave $600 to Nelson, who proceeded to a phone booth. When Nelson returned, she removed a mailing envelope from underneath her T-shirt. From the envelope, which contained several Ziploc packets of cocaine, Nelson gave Officer Tehada two Ziploc packets.

Later that evening, Officer Tehada called Timas and arranged for another meeting the next day at the Lot. On April 4, 1991 Timas, Nelson, and "Sonny" arrived by taxi. Officer Tehada gave $600 to Nelson, who ran to Kapi'olani Boulevard and left in a car going in the 'Ewa direction. When Nelson returned, they went to the Seaside Tower apartments (Seaside) in Waikīkī to split the drugs. In the lobby, Timas handed Officer Tehada a Ziploc packet containing cocaine.

During the early morning of April 10, 1991, Officer Tehada arranged with Timas to meet at the Handi Pantry on University Avenue and Date Street. In the Handi Pantry parking lot, Officer Tehada met Grant and Timas. Officer Tehada gave $600 to Grant, who then drove away. When Grant returned, he allowed Officer Tehada to inspect a "baggie-type cellophane packet" containing one ounce of cocaine. As instructed by Grant, Officer Tehada followed Grant back to Seaside. In Apartment 1102, Grant handed the baggie to Mori, who divided the cocaine on a scale. Mori weighed out one-fourth of an ounce and placed it into a paper bindle. Mori then gave the bindle to Officer Tehada. Mori testified that Officer Tehada scooped "some" cocaine from his bindle onto the mirror lying on the night stand. Officer Tehada denied doing so.

On April 19, 1991 Officer Tehada arranged with Timas for another transaction. Upon picking up Timas, Officer Tehada drove to the corner of Lewers Street and Kūhiō Avenue, Waikīkī. Mori arrived on a red moped. Timas told Mori that Officer Tehada wanted to buy one-fourth of an ounce of cocaine. After Officer Tehada parked the car, he and Timas went to Room 228 of the hotel located on that corner. Grant and Mori were in the room. Following a phone call, Mori told Officer Tehada that he needed to be driven to a place where he could pick up the drugs. Officer Tehada complied and drove Mori and Timas to Hunakai Street, Kāhala. Officer Tehada gave $600 to Mori, who went across the street. From across the street, a moped left and later returned. A little later, Mori returned to the car and handed Officer Tehada a manila envelope containing two Ziploc

packets of cocaine. Mori testified that Officer Tehada gave Mori "a little" cocaine from each package. Officer Tehada denied doing so.

On April 30, 1991 Officer Tehada arranged with Timas for another meeting. Timas, however, did not appear. Instead, Timas paged Officer Tehada and directed Officer Tehada to meet him at the corner of Lewers Street and Kūhiō Avenue, Waikīkī. At that corner Officer Tehada met Timas and Vicki Himmelmann (Himmelmann). Because they missed the drug source, Officer Tehada, Timas, and Himmelmann left for the Pagoda Terrace Hotel. At the hotel Officer Tehada gave $600 to Himmelmann, who went to get the drugs. While waiting for Himmelmann to return, Timas persistently asked Officer Tehada to sell him a gram of cocaine. Eventually, Officer Tehada gave in and offered Timas a "kickback," vernacular for a drug gift, in return for his role in the transactions. When Himmelmann returned, Officer Tehada drove Timas and Himmelmann back to Lewers, where they handed Officer Tehada a bindle of drugs. At Timas' suggestion, Officer Tehada used his car key to scoop two small mounds of drugs into the cellophane wrapper of a cigarette box and gave the cellophane wrapper to Timas. Timas then promised that Officer Tehada would get a better deal on his next transaction.

Following several phone calls, Officer Tehada met Timas and Gregory King (King) at Hobron Lane on May 17, 1991. They proceeded to the corner of University Avenue and Kapi'olani Boulevard. At that corner Officer Tehada gave $575 to King, who then entered 500 Ala Wai Plaza. When King returned, he handed Officer Tehada four Ziploc packets, each containing one-sixteenth of an ounce of cocaine.

On August 15, 1991 the grand jury indicted Timas, Nelson, Grant, Mori, Himmelmann, and King for the crime of Promoting a Dangerous Drug in the First Degree, HRS § 712–1241(1)(b)(ii)(A), in relevant part as follows:

> COUNT I: On or about the 3d day of April, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", and LOUISE M. NELSON, also known as "Louise", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

> COUNT II: On or about the 4th day of April, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", and LOUISE M. NELSON, also known as "Louise", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

> COUNT III: On or about the 9th day of April, 1991 to and including the 10th day of April, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", ARCHIE GRANT III, also known as "Archie", and FRANCIS Y. MORI, also known as "Mark", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

> COUNT IV: On or about the 19th day of April, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", and FRANCIS Y. MORI, also known as "Mark", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

> COUNT V: On or about the 30th day of April, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", and VICKI L. HIMMELMANN, also known as "Vicki", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

> COUNT VI: On or about the 17th day of May, 1991, in the City and County of Honolulu, State of Hawaii [Hawai'i], DAVID TIMAS, also known as "Jay", and GREGORY KING, also known as "Baby G", did knowingly distribute ... substances of an aggregate weight of one-eighth ounce or more, containing cocaine....

On February 21, 1992 Nelson pled guilty to Counts I and II. On April 7, 1992 Himmelmann pled guilty to Count V. On May 7, 1992 the jury acquitted King on Count VI.

## DISCUSSION

### I.

Timas contends that the trial court improperly impaneled the alternate jurors.

Alternate jurors are authorized by HRS § 635–26 (1985) which provides in relevant part as follows:

[I]f so directed by the court, additional jurors shall be drawn and impaneled to sit as alternate jurors.

HRS § 635–29(c) (1985) guarantees each party the right to at least one peremptory challenge of the alternate juror(s). It states, in relevant part, as follows:

(c) If an alternate juror or alternate jurors are to be impaneled, one or more additional peremptory challenges shall be allowed as provided by the rules of court.

The applicable court rule is Hawaiʻi Rules of Penal Procedure (HRPP) Rule 24(c) (1991). It states as follows:

**Alternate Jurors.** The court may direct that not more than 4 jurors in addition to the regular jury be called and impaneled to sit as alternate jurors who shall, in the order in which they are called, replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict. When the court directs that one or more alternate jurors be impaneled, each defendant shall be entitled to 1 additional peremptory challenge which may be used to challenge the alternate jurors only; and other peremptory challenges allowed to challenge the regular

jurors shall not be used to challenge alternate jurors.

HRS § 635–30 (1993) and HRPP Rule 24(b) both provide that in all cases, the prosecution shall be allowed as many peremptory challenges as are allowed to all defendants.

The Hawaiʻi Supreme Court has often stated that "[t]he fundamental starting point for statutory interpretation is the language of the statute itself.... [W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Where, ..., the operative language ... is undefined in a statute, we presume that the words in question "were used to express their meaning in common language."

. . .

\*　　\*　　\*　　\*　　\*　　\*

"[D]eparture from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given to the language[,]" or that a "literal interpretation would produce absurd or unjust results that are clearly inconsistent with the purposes and policies of the statute."

*Schmidt v. AOAO of the Marco Polo Apts.,* 73 Haw. 526, 531–32, 836 P.2d 479, 482–83 (1992) (citations omitted).

In the instant case, the trial court seated the alternate jurors in relevant part as follows. The clerk randomly selected Bernice Nouchi (Nouchi) and she was passed for cause. The court then announced that "[e]ach defendant is entitled to one peremptory challenge as to the alternate and the prosecutor is entitled to the total of the defendants." After the State waived its first peremptory challenge, Mori's counsel exercised Mori's peremptory challenge and Nouchi was excused.

The clerk randomly selected Diane Lau (Lau) and she was passed for cause. The State then waived its second peremptory challenge.[4] King's counsel waived his per-

---

**4.** The relevant transcript reports that this process commenced as follows:

THE COURT: Pass for cause. Thank you very much.

[COUNSEL FOR KING]—excuse me, I think it is the prosecutor's turn.
[DEPUTY PROSECUTING ATTORNEY]: The State waives.
THE COURT: The State waives.

emptory challenge. The State waived its third peremptory challenge. Grant's counsel waived his peremptory challenge. The State waived its fourth peremptory challenge. Finally, Timas' counsel waived his peremptory challenge.

The clerk then randomly selected Peggy Vollmann (Vollmann). After she was passed for cause, the court stated, "The parties have exhausted their peremptory challenges as to the alternates. I will ask the clerk to swear in the jury." At that point, the following colloquy ensued:

[MORI'S COUNSEL]: Your Honor, I'm a little confused with respect to peremptory challenges. We were just allowed one.

THE COURT: One as to the alternate, that's what the rule says. When a Court directs that one or more alternate jurors be impaneled, each defendant shall be entitled to one additional peremptory challenge which may be used to challenge the alternate jurors only.

\* \* \* \* \* \*

THE COURT: All right. The language of the rule is that: Each defendant shall be entitled to one additional peremptory challenge which may be used to challenge the alternate jurors, plural, only.

[GRANT'S COUNSEL]: Your Honor, this alternate was not seated and we did not have the opportunity to question.

THE COURT: You see, if I had seated that other second one, we would be proceeding on the struck jury that was just condemned by the Supreme Court.

[GRANT'S COUNSEL]: But Your Honor—

THE COURT: And that's the reason why I decided to put only one at a time. If I put—okay, then you would know who the second one is. If you strike the first one, then the second one will be there and that's the exact type of jury selection that our Supreme Court just recently condemned, right, and reversed the conviction.

All right, and that's the reason why I decided one juror at a time because you

[COUNSEL FOR KING]: Your Honor, we would waive our perempt.

would not know who the second one was going to be.

\* \* \* \* \* \*

[KING'S COUNSEL]: Making a further record in this case accepting the Court's ruling, we could object though that this juror be sat [sic] without the defense having had the opportunity each for a single perempt.

And that in this case, a perempt[ory challenge] should have been exercised based on the juror's background that she appears to be a conservative juror who is interested in fund raising, for the record.

\* \* \* \* \* \*

[TIMAS' COUNSEL]: If it please, Your Honor, since [King's Counsel] has noted that she would have stricken the prospective juror had she been given the extra strike, I myself was under the impression that we were entitled to an extra strike and I would have stricken the juror if she had not.

Therefore, you are—based on the grounds mentioned including the Constitution [sic] of the State of Hawaii [Hawai'i] and the United States of America, I would move for mistrial on the grounds that my client has been deprived of due process of law and effective counsel by not being able to exercise these peremptory challenges, as per I believe, the statute says. Therefore, I move for mistrial.

[MORI'S COUNSEL]: I will join also.

[GRANT'S COUNSEL]: We would join also.

\* \* \* \* \* \*

THE COURT: Okay. I will deny your motion.

Prior to opening statements, Lau replaced one of the twelve jurors and subsequently participated in the verdict. Vollmann was excused before final arguments and did not participate in the verdict.

■ The trial court's procedure does not conform to the procedure we announced in *State v. Carvalho*, 79 Hawai'i 165, 880 P.2d

Transcript, April 14, 1992 at p. 198.

217 (App.), *cert. granted,* 77 Hawai'i 373, 884 P.2d 1149 (1994), *cert. dismissed,* 78 Hawai'i 474, 896 P.2d 930 (1995).

[T]he defendant's right to one peremptory challenge to alternate jurors under HRPP Rule 24(c) is a right pertaining to all the alternate jurors and therefore the defendant shall not be called upon to exercise the challenge until all potential alternate jurors have been examined and passed on challenges for cause.

*Id.* at 172, 880 P.2d at 224.

■ We also stated in *Carvalho* "that the denial or impairment of a defendant's right of peremptory challenge in a criminal case is reversible error not requiring a showing of prejudice." *Id.* at 174, 880 P.2d at 226. In *Carvalho,* however, the defendant's right of peremptory challenge was violated with respect to alternate juror David Polhemus and "Mr. Polhemus later replaced one of the jurors on the 'regular' panel and became the foreperson of the jury." *Id.* at 171, 880 P.2d at 223. In the instant case, alternate juror Vollmann was excused prior to the jury's deliberations. Therefore, with respect to her, the trial court's peremptory challenge error is harmless error. *United States v. Evans,* 848 F.2d 1352, *modified on other grounds,* 854 F.2d 56 (5th Cir.1988) (defendant was not prejudiced by the denial of peremptory challenge where alternate jurors were excused prior to deliberations).

■ Alternate juror Lau replaced a juror and participated in the verdict. However, Timas had an opportunity to peremptorily challenge her and declined to do so. Therefore, Timas was not denied his right to peremptorily challenge juror Lau.

■ The improper impanelling of alternate juror Lau is not one of Mori's points on appeal. Ordinarily, points of error not presented on appeal in accordance with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (1993) will be disregarded. However, we may notice a plain error affecting a criminal defendant's substantial rights. *State v. Schroeder,* 76 Hawai'i 517, 532, 880 P.2d 192, 207 (1994) (citing HRAP 28(b)); *see also State v. McGriff,* 76 Hawai'i 148, 155, 871 P.2d 782, 789 (1994). We conclude that this denial of Mori's statutory right was plain error.

## II.

■ Defendants moved for a judgment of acquittal after the State rested and at the conclusion of all the evidence. Defendants contend that the trial court erred in denying their two motions for judgment of acquittal. The standard of review of the trial court's denial of a motion for a judgment of acquittal is "whether, upon the evidence viewed in light most favorable to the prosecution and in full recognition of the province of the jury, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *State v. Alston,* 75 Haw. 517, 528, 865 P.2d 157, 164 (1994) (citing *State v. Nakoa,* 72 Haw. 360, 363, 817 P.2d 1060, 1062 (1991)).

### A.

#### *A Reasonable Mind Might Fairly Conclude That Entrapment Was Not Proven*

In this case Defendants sought a judgment of acquittal based on their defense of entrapment. HRS § 702–237(1) (1993) states as follows:

(1) In any prosecution, it is an affirmative defense that the defendant engaged in the prohibited conduct or caused the prohibited result because the defendant was induced or encouraged to do so by a law enforcement officer, or by a person acting in cooperation with a law enforcement officer, who, for the purpose of obtaining evidence of the commission of an offense, either:

(a) Knowingly made false representations designed to induce the belief that such conduct or result was not prohibited; or

(b) Employed methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.

HRS § 701–115(2)(b) (1985) states as follows:

(b) If the defense is an affirmative defense, the defendant is entitled to an

acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability.

Defendants contend that, as a matter of law, they were entrapped by the police into the drug transactions. In other words, Defendants contend that no reasonable mind might fairly conclude that the evidence failed to prove more probably than not that they were entrapped. We conclude that, both at the conclusion of the State's case and at the conclusion of all of the evidence, the evidence permitted a reasonable mind to fairly conclude that Defendants had not sustained their burden of proving entrapment.

The instructions given to the jury stated in relevant part as follows:

There are two elements of this defense which each of the defendants must prove by a preponderance of the evidence. These two elements are:

One, that the defendant engaged in the prohibited conduct or caused the prohibited result because he was induced or encouraged to do so by a law enforcement officer or by a person acting in cooperation with a law enforcement officer; and,

Two, that the law enforcement officer or a person acting in cooperation with a law enforcement officer did for the purpose of obtaining evidence of the commission of an offense employed [sic] methods of persuasion or inducement which created a substantial risk that the offense would be committed by a person other than those who are ready to commit it.

* * * * * *

An offer to buy narcotics in and of itself is not a method which creates a substantial risk that the offense would be committed by a person other than those ready to commit it.

■ In Hawai'i, "[t]he focus of this inquiry is not on the predisposition of the defendant to commit the crime charged, but rather is on the conduct of the law enforcement officials." *State v. Agrabante*, 73 Haw. 179, 192–93, 830 P.2d 492, 499 (1992) (quoting *State v. Anderson*, 58 Haw. 479, 483, 572 P.2d 159, 162 (1977)).

■ In the instant case, the evidence permitted the jury to decide at the end of the State's case, and at the conclusion of all the evidence, that the evidence did not prove element two of the entrapment defense by a preponderance of the evidence and that Officer Tehada's conduct merely provided Defendants with an opportunity to commit the offense of promoting a dangerous drug in the first degree. *Agrabante*, 73 Haw. at 194–95, 830 P.2d at 500; *State v. Tookes*, 67 Haw. 608, 614, 699 P.2d 983, 987 (1985).

## B.

■ A *fortiori*, the police conduct in this case was not so outrageous that due process principles barred his conviction. *State v. Agrabante, supra.*

## C.

### *Guilt Was a Question of Fact*

Upon the evidence viewed in light most favorable to the prosecution and in full recognition of the province of the jury, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

## III.

Timas and Mori contend that the trial court abused its discretion when it joined all of the trials and declined to sever them. When it denied Mori's October 30, 1991 pretrial motion, the trial court ruled:

In this case the common fact appears to be the undercover officer Tihata [sic] who made the successful buys. All the buys involve the Defendant Timas as one of the co-defendants. All the buys took place from April 3 through May 17, 1991 and I understand all the buys took place in Waikiki [Waikīkī]. It appears to this Court that there are sufficient facts that exist and under Rule 8(b)(3) in the form of drug dealings between the undercover officer and Timas to which each defendant was alleged to be involved at different points in time from April 3[d] to May 17th.

And that appears to me to satisfy the requirements of Rule 8(b)(3) Subsection I or II and I'm going to deny the motions.

At trial, Timas and Mori orally moved for severance due to prejudice from the admission of State Exhibits 9 through 14,[5] all of which are hearsay. The trial court denied the motions on the ground that the evidence showed the *modus operandi* of Officer Tehada.

Joinder of defendants in a single trial is authorized by HRPP Rule 8(b)(3), which provides as follows:

(b) *Joinder of Defendants.* Two or more defendants may be joined in the same charge:

\* \* \* \* \* \*

(3) when, even if conspiracy is not charged and all of the defendants are not charged in each count, the several offenses charged:

(i) were part of a common scheme or plan; or

(ii) were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others.

■■■ The instant case involves HRPP Rule 8(b)(3)(ii) more than it does HRPP Rule 8(b)(3)(i). However, the principles guiding the application of HRPP Rule 8(b)(3)(i) are relevant. In *State v. Renon*, 73 Haw. 23, 32, 828 P.2d 1266, 1270 (1991), the Hawai'i Supreme Court stated that HRPP Rule 8(b)(3)(i) applies to a common scheme or plan where: (1) the evidence of the prior incidents are relevant to the determination of the case, pursuant to Hawai'i Rules of Evidence (HRE) Rule 404(b), and (2) on balance, the probative value of the incidents substantially outweigh the danger of the unfair prejudice

to the defendants, pursuant to HRE Rule 403. "Unfair prejudice" is evidence that tends to influence the trial result in a forbidden or otherwise improper way. A. Bowman, *Hawaii [Hawai'i] Rules of Evidence Manual* 85 (1990). In *Renon*, the Hawai'i Supreme Court also noted that the prosecution is generally entitled to show the entire history of a conspiracy to commit crimes even though conspiracy was not formally charged in the indictment. *Renon*, 73 Haw. at 33–34, 828 P.2d at 1271 (citing *State v. Pulawa*, 58 Haw. 377, 384, 569 P.2d 900, 906 (1977)), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978).

■■■ The joinder denies a defendant a fair trial in three possible situations: (1) where the core of each defense is in irreconcilable conflict with the other, (2) where the defendant in question is prevented from introducing evidence that would have been admissible in that defendant's separate trial not involving other defendants, and (3) where evidence damaging to the defendant in question is admitted and it would not have been admissible in that defendant's separate trial not involving other defendants. *State v. Gaspar*, 8 Haw.App. 317, 327–28, 801 P.2d 30, 35 (1990). The defendant has the burden of proving a denial of a fair trial. *State v. Lester*, 64 Haw. 659, 669, 649 P.2d 346, 353 (1982).

Severance of joint trials is governed by HRPP Rule 14 which states:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in a charge or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or

---

**5.** State's Exhibit 9 was a taped telephone call from Officer Tehada to Danielle Tucker (Tucker) on April 9, 1991 to assist Officer Tehada in his attempt to contact Louise Nelson (Nelson). State's Exhibit 10 was a taped telephone call from Officer Tehada to Nelson on April 9, 1991 wherein Officer Tehada contacted Nelson and they agreed to meet at a parking structure to purchase a quarter ounce of cocaine. State's Exhibit 11 was a taped telephone call from Officer Tehada to Tucker on April 9, 1991 wherein Officer Tehada confirmed that he spoke to Nel-

son. State's Exhibit 12 was a taped telephone call from Tucker to Officer Tehada on April 9, 1991 wherein Timas and Tucker agreed to meet Tehada at Seaside Avenue. State's Exhibit 13 was a taped telephone call from Officer Tehada to Tucker on April 9, 1991 wherein Officer Tehada arranged to be paged. State's Exhibit 14 was a taped telephone call from Officer Tehada to Tucker on April 10, 1991 wherein Tucker instructed Officer Tehada to meet David Timas and Archie Grant III at the Food Pantry on Date Street.

provide whatever other relief justice requires.

■■■ When deciding an HRPP Rule 14 motion for severance, the trial court must "balance the possible prejudice to the defendant from joinder with the public interest in efficient use of judicial time through joint trial of defendants and offenses which are connected." *State v. Matias*, 57 Haw. 96, 98, 550 P.2d 900, 902 (1976). Upon review, the appellate court

> [m]ay not conclude that the defendant suffered prejudice from a joint trial ... unless it first concludes that a defendant was denied a fair trial. What might have happened had the motion for severance been granted is irrelevant speculation.

*Gaspar*, 8 Haw.App. at 327, 801 P.2d at 35 (quoting *State v. White*, 5 Haw.App. 670, 672, 706 P.2d 1331, 1333 (1985)). *See also State v. Mabuti*, 72 Haw. 106, 115, 807 P.2d 1264, 1269 (1991).

■■ In the instant case the trial court did not abuse its discretion in joining the trials and refusing to sever them. The trial involved six drug transactions. All six drug transactions involved Officer Tehada and Timas. Two of the six transactions involved Mori. Timas and Mori did not deny their involvements and each of them relied on the affirmative defense of entrapment. In the words of Mori's closing argument:

> And you have to ask a question to yourself, should the police department be in the drug business? I mean, for—just for the purposes of inducing, persuading or exploiting a drug addict. And then manipulating or capitalizing on his weakness so as to encourage him to go out and buy drugs for them and then turn around and arrest that person.
>
> Now, obviously the answer should be, no, because the police should not be in the business of dealing drugs or exploiting people that have a human weakness in an attempt to make cases and create crime and then turn around and arrest those people for those crimes.

> \* \* \* \* \* \*

> ... So Mr. Mori was in a situation where he's totally dependent upon drugs. He was an addict.

> \* \* \* \* \* \*

> ... Mr. Mori from 1990, May 1990 until April was, basically, penniless, without any money to buy cigarettes. He lived at home and drove without insurance. And as a result of that he'd hang out seeking handouts of drugs in order to support his habit and that's what he did.
>
> During that time period anyone that looked at Mr. Mori could tell that he was an addict to the point were [sic] dealers wouldn't even front him drugs because they knew that if they gave him drugs what he'd do with [it]. What he'd do with it is he'd use it rather than sell to other people and make a profit for those dealers. And so he wasn't even able to get drugs.
>
> As a front they had no money to buying it basically what he had to do was hang around people like Danielle Tucker in order to get drugs. And as a result of that we then come to the situation in April....

> \* \* \* \* \* \*

> And Mr. Mori has already testified that he never distributed drugs. You know, he was basically a user that was addicted to cocaine. Mr. Mori does not deny his dependence upon drugs. And when he got—went up on the stand willingly and voluntarily and told you folks what his situation is completely and honestly and as a result of that we have a situation where this person admitted what his weakness was then was exploited by the police knowing his weakness and offered drugs to the point where he'd go out and buy drugs for them.

## IV.

Mori contends that the trial court violated his constitutional rights and abused its discretion when it prohibited him from testifying (1) that, prior to the two transactions in which he was involved, Grant told him that Officer Tehada promised to kick back drugs, and (2) that, during the division of the drugs, Grant asked Officer Tehada for the drugs promised.

Mori relies on *State v. Lowther,* 7 Haw. App. 20, 740 P.2d 1017 (1987), and contends that the trial court denied him his constitutional due process right to be afforded a meaningful opportunity to present a complete defense. *Id.* at 23, 740 P.2d at 1019.

Since the admissibility of Mori's testimony of offer (2) depends on the admissibility of Mori's testimony of offer (1), the dispositive question is whether the circuit court abused its discretion when it refused to admit Mori's testimony of offer (1). Our answer is no.

HRE Rule 801(3) states as follows:

> (3) "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Hearsay is inadmissible at trial unless it qualifies as an exception to the rule against hearsay. *State v. Ortiz,* 74 Haw. 343, 357, 845 P.2d 547, 554 (1993).

At trial, Mori's counsel contended that the evidence was not hearsay:

> Now, whether it's true or not, it's irrelevant. It goes to the conduct of the defendant in hanging around so that he could get drugs. It's not offered for the truth of the matter asserted rather than course of conduct and state of mind of my defendant, which is an exception.
>
> \* \* \* \* \* \*
>
> It's not based on the truth of [the] matter asserted that they were going to get drugs, but rather [Mori's and/or Grant's] belief as to what was going to happen, so it's not for, it's definitely an exception to the hearsay rule.

Mori asserted the affirmative defense of entrapment. That affirmative defense burdened Mori to prove the following five elements: (A) Mori's engagement in the prohibited conduct; (B) Officer Tehada's promise to kick back drugs; (C) Mori's knowledge of element (B); (D) the fact that element (B) was excessive and overpowering inducement; and (E) the fact that element (B) motivated Mori to do element (A).

Mori contends that his testimony was offered to prove elements (C) and (E). However, assuming his testimony was offered to prove elements (C) and (E), it was also relevant to prove element (B).

To the extent that Mori's testimony was offered to prove element (B), it was hearsay. Mori cites no relevant exception permitting it to be introduced into evidence, and we know of none. In other words, assuming Mori's testimony was admissible as evidence in satisfaction of Mori's burdens to prove elements (C) and (E), it was inadmissible as evidence in satisfaction of Mori's burden to prove element (B).

In the absence of Mori's hearsay testimony, there is no evidence of element (B). However, evidence of element (B) is crucial to Mori's affirmative defense of entrapment. In the absence of evidence of element (B), evidence of elements (C) and (E) is inconsequential.

In some situations where evidence is admissible for one purpose and inadmissible for another, the evidence may, upon request, be admitted for the admissible purpose subject to an instruction to the jury not to consider it for the inadmissible purpose. HRE Rule 105. Mori made no such request. Moreover,

> [HRE Rule 105] is not designed to provide automatic, uncritical admission in every such instance. As McCormick observes: "In situations ... where the danger of the jury's misuse of the evidence for the incompetent purpose is great, and its value for the legitimate purpose is slight ... the judge's power to exclude the evidence altogether would be recognized." McCormick § 59.

Commentary, HRE Rule 105.

In that light, we conclude that the circuit court did not abuse its discretion when it implicitly decided that the danger of the jury's misuse of Mori's testimony for the incompetent purpose was more, and its value for the legitimate purpose was less, and declined to admit Mori's testimony.

## V.

Mori contends that the trial court violated his constitutional rights and abused its discretion when it prevented his counsel from

asking Officer Tehada two questions. The first question was as follows:

Q Well, in this particular case over one quarter ounce is—what was the—I guess cut-off quantity to be construed as distribution; is that correct?

The State objected "[b]ecause once it is established that they're different classes of offenses depending upon the amount distributed or possessed, then you get into the penalty area, and it's not relevant." Mori's counsel responded in relevant part as follows:

[MORI'S COUNSEL]: The relevance of that is it goes to the motive behind the officer. Obviously, if he wants the person to buy larger quantities for him, which result in, you know, being characterized as a seller or distributor versus a person that is—can be characterized that uses a lower quantity as a user or a possessor, you know, that is a big difference. In this case we're dealing with a situation where these—setting these guys up as sellers in the larger quantities.

The second question was as follows:

Q Now, in your training did you receive any training regarding how much an addict would consume of coke?

The State objected on the basis of relevance. Mori's counsel argued that "[t]he relevance of that is my whole argument—defense, Your Honor, if the outrageous conduct of the officer is based on manipulating an addict."

In this appeal, Mori contends that he

should have been allowed to fully and completely cross-examine TEHADA, including his understanding of why the specific amount of ¼ ounce of cocaine was requested in all six transaction [sic], no more or no less than this amount. The jury should have been told how [Officer Tehada] knew that this small amount automatically subjects a person to a mandatory 20 years as a Class A felony, that it was part of a law enforcement scheme to collar small time

users with the highest penalty available under Hawaii's [Hawai'i's] drug laws.

Opening Brief at 27.

■ A person's right under the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i State Constitution to cross-examine and to impeach the confronted witnesses, *State v. Okumura*, 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995) (citing *State v. Napeahi*, 57 Haw. 365, 372–73, 556 P.2d 569, 574 (1976)), is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the trial process. *Id.* (citing *State v. El'Ayache*, 62 Haw. 646, 649, 618 P.2d 1142, 1144 (1980)).

■ Both questions were irrelevant. Officer Tehada's "motive" and knowledge of "how much an addict would consume of coke" were not relevant to any issue in the case.

■ The entrapment issue was whether the police used "methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it." The jury was instructed that an offer to buy, in and of itself, is not such a method. The offense charged was a class A felony. The size of the purchase was relevant to the entrapment issue.[6] However, we reject the suggestion that the courts should bar the police, when conducting sting operations, from purchasing class A felony quantities of drugs from addicts. As long as the police do not use methods of persuasion or inducement which create a substantial risk that the offense would be committed by persons other than those who are ready to commit it, they may employ undercover operations to collar drug users whose desire to use drugs motivates them to be involved in class A felony drug distributions as a method of obtaining drugs for themselves. The simple truth is that if there were no drug users, the drug suppliers and distributors would have no customers. The question whether Mori was entrapped into committing the class A felony offenses was submitted to the jury.

---

6. Under HRS § 712–1241, it is a class A felony to possess one ounce of cocaine or to distribute one-eighth ounce of cocaine. Under HRS § 712–1242, it is a class B felony to possess one-eighth ounce of cocaine or to distribute any amount of cocaine. Under HRS § 712–1243, it is a class C felony to possess any amount of cocaine.

Their negative answer was supported by the evidence.

Mori contends for the first time on appeal that his questions were relevant to "sentencing entrapment." The following quotes from the following federal cases discuss sentencing entrapment.

> Hayden further presents the rather novel argument that he was subjected to conduct which he describes as "sentencing entrapment." "Sentencing entrapment" as defined by the defendant, posits the situation where a defendant, although predisposed to commit a minor or lesser offense, is entrapped in [sic] committing a greater offense subject to greater punishment. Hayden argues that this is especially true in view of the mandatory minimum sentences for drug offenses. Essentially Hayden invites this court to abandon its long-established rule of entrapment which focuses on the predisposition of the defendant to commit crime. Perhaps there is such a thing as "sentencing entrapment," *see United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir.1991), but we are not persuaded that Hayden has succeeded in establishing it. The record does not show with sufficient clarity that Hayden was predisposed to commit only a lesser offense.

*United States v. Stuart,* 923 F.2d 607, 613–14 (8th Cir.1991).

> We are not prepared to say there is no such animal as "sentencing entrapment." Where outrageous official conduct overcomes the will of an individual predisposed only to dealing in small quantities, this contention might bear fruit. The record reveals, however, another predisposition in Twila Smith: to help Agent Stevens find methamphetamine in whatever quantities he desired. By definition, her protest of entrapment—sentencing or otherwise— fails. Dennis and Twila Smith's sentences are therefore affirmed.

*United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir.1991) (citation omitted).

Fernandez does not tire of making bold claims unsubstantiated by the record. He asserts that he was the victim of "sentencing entrapment" that constituted a mitigating circumstance not adequately taken into consideration by the Sentencing Commission and thus warranted a departure from the guideline sentence applicable in his case. *See* 18 U.S.C. § 3553(b). Entrapment, however, is not what Fernandez is really protesting. He does not argue that he lacked a predisposition to buy multiple kilogram amounts of cocaine and that his will was overborne by unrelenting government persistence. Rather, Fernandez argues that there is something unsavory about purposeful manipulation of drug amounts offered for sale in reverse-buy sting operations in order to ratchet up eventual sentences and that he was in fact victimized by such craftiness on the part of the undercover agent in this case.

There is no doubt that by providing advance notice of the sentencing consequences associated with particular drug transactions the Sentencing Guidelines grant the government, in the carrying out of its investigative and prosecutorial functions, great power to dictate the options which will ultimately be available to the sentencing court. Several courts of appeals have intimated that sentencing adjustment may be in order when the government structures its stings solely with an eye toward wielding that power. [Citations omitted.] Our inclination, however, is not to subject isolated government conduct to a special brand of scrutiny when its effect is felt in sentence, as opposed to offense, determination. If we are willing to accept the assumption apparently approved by Congress that dealing in greater quantities of drugs is a greater evil, it is not clear to us what the precise legal objection to governmental behavior based on cognizance of relative penal consequences in this area could be (so long as it does not rise to the level of true entrapment or conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes ...," *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). In any event, Fernandez presents to us no evidence that manipulation of any order occurred in his

case. He and Rodriguez were eager to buy as much cocaine as possible, boasting about the amount they could "move" in a week.

*United States v. Cotts,* 14 F.3d 300, 306 n. 2 (7th Cir.1994).

In other words, sentencing entrapment is either or both of the following: (a) it is an entrapment defense to the class A felony but not to the class C felony, and/or (b) it is a mitigating factor in sentencing for the class A felony.

We conclude that, under either definition, Mori's point is without merit. The entrapment defense to the class A felony was presented to, and rejected by, the jury. Therefore, (a) was not proven and (b) does not apply.

## VI.

Timas contends that he was the victim of ineffective assistance of trial counsel and alleges the following six instances. First, counsel allegedly inadequately prepared for trial by untimely investigating the May 17, 1991 report on Tucker. If counsel had promptly investigated this report, he would have chosen a different approach to *voir dire* and would not have waived his opening statement. Second, counsel allegedly used the federal (subjective) standard for entrapment in his opening statement. Third, counsel discussed derivative entrapment in his closing argument even though the court ruled that it would not be allowed. Fourth, in his closing argument, counsel said nice things about the police, thus allegedly bolstering their credibility. If the prosecutor had made these statements, it would have been plain error. *State v. Marsh,* 68 Haw. 659, 728 P.2d 1301 (1986). Fifth, counsel allegedly failed to offer a motion to sever trials. Sixth, counsel relinquished the role of lead counsel.

 Counsel's assistance is not ineffective if it was "within the range of competence demanded of attorneys in criminal cases." *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (citing *State v. Antone,* 62 Haw. 346, 348, 615 P.2d 101, 104 (1980)). The counsel's competence is presumed. 22 C.J.S. *Criminal Law* § 305 (1989); *Strickland v. Washington,* 466 U.S.

668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). To rebut the presumption, the petitioner has the burden to prove: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potential meritorious defense." *State v. Reed,* 77 Hawai'i 72, 83, 881 P.2d 1218, 1229 (1994) (citing *Domingo v. State,* 76 Hawai'i 237, 241, 873 P.2d 775, 779 (1994)).

 In analyzing the first item of this burden, the Hawai'i Supreme Court stated that "[g]eneral claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry." *Dan,* 76 Hawai'i at 427, 879 P.2d at 532. Also, "[s]pecific actions or omissions alleged to be error but which had an obvious tactical basis for *benefitting* the defendant's case will not be subject to *further scrutiny.*" *Id.* (emphasis in original) (quoting *Briones v. State,* 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993)). The court reasons that "[l]awyers require and are permitted broad latitude to make on-the-spot strategic choices in the course of trying a case." *State v. Silva,* 75 Haw. 419, 441, 864 P.2d 583, 593 (1993) (citing *State v. Kelekolio,* 74 Haw. 479, 524, 849 P.2d 58, 78 (1993)).

 "[I]f, however, the action or omission had no obvious basis for benefitting the defendant's case *and* it 'resulted in the withdrawal or substantial impairment of a potentially meritorious defense,' then [it] ... will be evaluated as ... information that ... an ordinary competent criminal attorney should have had." (Emphasis in original.) *Dan v. State,* 76 Hawai'i at 427, 879 P.2d at 532 (quoting *Briones v. State,* 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993)). "If the record is unclear or void as to the basis for counsel's actions, counsel shall be given the opportunity to explain his or her actions in an appropriate proceeding before the trial court judge." *Briones,* 74 Haw. 442, 463, 848 P.2d 966, 977 (1993) (citing *Matsuo v. State,* 70 Hawai'i 573, 578, 778 P.2d 332, 335 (1989)). With respect to the second item of this burden, the existence of a "potentially meritorious defense" is determined merely by the possible effect of the defense on the decision maker. *See Dan,* 76 Haw. at 427, 879 P.2d at 532. Accordingly, a showing of actual prejudice is not necessary. *See id.*

Upon a review of the record, we conclude that Timas was not the victim of the ineffective assistance of counsel. Timas' counsel adequately prepared for trial, did not use the federal (subjective) standard in his opening statement, and did not fail to offer a motion to sever the trials. Although Timas' counsel, in his closing argument, did discuss derivative entrapment[7] after the court ruled that he could not, the discussion was in support of, and not prejudicial to, Timas' entrapment defense. Similarly, although Timas' counsel, in his closing argument, said nice things about the police, he also said bad things about what they did in this case and his statements were in support of, and not prejudicial to, Timas' entrapment defense. Finally, there is no evidence that the fact that Timas' counsel was not lead counsel was prejudicial to Timas' entrapment defense.

## CONCLUSION

Accordingly, we affirm the July 6, 1992 Judgment convicting Timas. We vacate the June 15, 1992 Judgment convicting Mori and remand for a new trial. Solely with respect to Grant, we dismiss his appeal as moot, vacate the July 8, 1992 Judgment of conviction, and dismiss all related criminal proceedings against him.

---

**7.** The "derivative entrapment" that Timas' counsel argued was that Timas engaged in the prohibited conduct because he was encouraged to do so by a person acting in cooperation with a law enforcement officer, namely, Danielle Tucker.