**NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-19-0000666**
**09-SEP-2022**
**07:56 AM**
**Dkt. 148 MO**

NO. CAAP-19-0000666
(Consolidated with Nos. CAAP-19-0000689 and CAAP-19-0000692)

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

**CAAP-19-0000666**
STATE OF HAWAI'I, Plaintiff-Appellee, v.
LAMA LAUVAO, Defendant-Appellant, and
WESLEY SAMOA; NATISHA TAUTALATASI,
Defendants-Appellees

**CAAP-19-0000689**
STATE OF HAWAI'I, Plaintiff-Appellee, v.
NATISHA TAUTALATASI, Defendant-Appellant, and
WESLEY SAMOA; LAMA LAUVAO, Defendants-Appellees

**CAAP-19-0000692**
STATE OF HAWAI'I, Plaintiff-Appellee, v.
WESLEY SAMOA, Defendant-Appellant, and
LAMA LAUVAO; NATISHA TAUTALATASI,
Defendants-Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CASE NO. 3CPC-18-0000724)

MEMORANDUM OPINION
(By:  Hiraoka, Presiding Judge, Wadsworth and Nakasone, JJ.)

In this consolidated appeal,[1] Defendants-Appellants
Lama Lauvao (**Lauvao**), Natisha Tautalatasi (**Tautalatasi**), and
Wesley Samoa (**Samoa**) (collectively, **Defendants-Appellants**) appeal
from the September 13, 2019 Judgment of Conviction and Sentence

---

[1]      All three cases were consolidated under CAAP-19-0000666.

entered by the Circuit Court of the Third Circuit[2] (**Circuit Court**) against each Defendant-Appellant.

This case arises out of a September 17, 2018 incident, captured on a surveillance video, in which the complainant, John Kanui (**Kanui**), a security guard at the Kona Seaside Hotel (**Kona Seaside**) in Kailua-Kona, Hawaiʻi, sustained severe life-threatening injuries during an altercation involving Defendants-Appellants and became quadriplegic as a result of those injuries. Plaintiff-Appellee State of Hawaiʻi (**State**) charged Defendants-Appellants by a September 19, 2018 Complaint with Attempted Murder in the Second Degree (**Attempted Murder Second**) in violation of Hawaii Revised Statutes (**HRS**) §§ 705-500 and 707-701.5.[3] Following a joint trial, the jury found Tautalatasi and Samoa guilty as charged and Lauvao guilty of the included offense of Assault in the First Degree (**Assault First**) in violation of HRS § 707-710(1). Tautalatasi and Samoa were sentenced to life terms of imprisonment with the possibility of parole. Lauvao was sentenced to a ten-year term of imprisonment.

On appeal, Lauvao raises six points of error,[4] contending that: (1) the State failed to prove beyond a reasonable doubt that Lauvao did not act in defense of Tautalatasi; (2) the Circuit Court plainly erred in allowing Officer Len Hamakado (**Officer Hamakado**) to offer his subjective and prejudicial narration of the events depicted in State's

---

[2]    The Honorable Melvin H. Fujino presided.

[3]    The Complaint charged Lauvao, Samoa, and Tautalatasi as principals and/or accomplices with Attempted Murder Second, as follows:

> On or about the 17th day of September, 2018 in the County and State of Hawaii, WESLEY SAMOA, LAMA LAUVAO, AND NATISHA TAUTALATASI, as principals and/or accomplices, intentionally engaged in conduct, which, under the circumstances as he, she or they believed them to be, constituted a substantial step in the course of conduct intended to culminate in their commission of the crime of Murder in the Second Degree, said crime being intentionally or knowingly caused the death of another person, JOHN KANUI, thereby committing the offense of Attempted Murder in the Second Degree, in violation of Section 705-500 and 707-701.5, Hawaiʻi Revised Statutes, as amended.

[4]    Lauvao's points of error have been edited for clarity. Portions of Lauvao's Opening Brief, in its Points of Error and Argument sections, do not comply with Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28.

Exhibit 13A, a surveillance video of the incident (**Incident Video**); (3) the prosecutor committed misconduct by demeaning the defendants' defenses during voir dire; (4) the prosecutor engaged in misconduct by adducing Officer Hamakado's lay opinion that fists and legs were "deadly" or "dangerous" weapons; (5) the Circuit Court's instructions to the jury were prejudicially erroneous and misleading for using the term "*lesser* included offenses" instead of "included offenses;" and (6) the Circuit Court abused its discretion in allowing the admission of State's Exhibit 45A, a video of Kanui undergoing rehabilitation (**Rehabilitation Video**) three months after the incident, where any minimal probative value was outweighed by its substantial prejudice.

Tautalatasi raises four points of error,[5] contending that: (1) the Circuit Court erred in not conducting the required on-the-record review of the Rehabilitation Video as to its probative value versus prejudicial effect; (2) the Circuit Court erred in allowing the prosecutor to admit non-expert opinion evidence of bare hands and feet as dangerous or deadly weapons, and in allowing the prosecutor to review the Incident Video with Tautalatasi, because it was cumulative, prejudicial and violated Tautalatasi's constitutional right against self-incrimination; (3) Tautalatasi was denied her right to effective counsel when she was cross-examined on her opinion that bare hands and feet constituted dangerous weapons, when she was asked to identify and agree with the Incident Video in great detail, when Tautalatasi's trial counsel (**Trial Counsel**) failed to object during cross-examination, failed to present expert evidence on issues of intent and the nature of dangerous or deadly weapons, failed to object to the admission of the Rehabilitation Video, failed to pursue severance of the trial, and for making damaging statements during closing argument; and (4) while Tautalatasi has not found

_____

[5]     Tautalatasi's points of error have been edited for clarity. Portions of Tautalatasi's Third Amended Opening Brief do not comply with HRAP Rule 28.  Tautalatasi's Third Amended Opening Brief was filed December 7, 2021, following a substitution of Tautalatasi's counsel while the appeal was pending.  The State was allowed to file, and did file, a supplemental answering brief on January 6, 2022.

a Hawaiʻi case discussing whether bare hands and feet constitute dangerous or deadly weapons, other jurisdictions have concluded that they cannot be so considered.

Samoa raises eight points of error,[6] contending that: (1) there was insufficient evidence to support Samoa's conviction where he did not attempt to cause Kanui's death and where he was not an accomplice to Tautalatasi or Lauvao; (2) there was insufficient evidence to support Samoa's conviction where he used force to defend Tautalatasi; (3) the Circuit Court abused its discretion in denying Samoa's motions to sever; (4) the Circuit Court erred or plainly erred in allowing Officer Hamakado to narrate during the playing of the Incident Video; (5) the Circuit Court erred in granting the State's Motion to Determine Voluntariness; (6) the prosecutor committed misconduct; (7) the Circuit Court's instructions to the jury were prejudicially erroneous and misleading for using the term **"*lesser* included offenses"**; and (8) the Circuit Court abused its discretion in allowing the State to adduce evidence of Kanui's condition three months after the incident in the Rehabilitation Video.

After careful review, we conclude that the Circuit Court abused its discretion in admitting the Rehabilitation Video, and that this error was not harmless beyond a reasonable doubt. We also conclude that the Circuit Court did not err in denying the motions to sever, and that there was sufficient evidence to support the challenged convictions of Lauvao and Samoa.[7] In light of our disposition vacating and remanding for a new trial, we do not reach the remaining points of error.

## I. BACKGROUND

### A. Motions to Sever

On April 12, 2019, the Circuit Court heard Defendant Wesley Samoa's Motion to Sever Defendants, filed January 22, 2019

---

[6] Samoa's points of error have also been edited for clarity.

[7] Tautalatasi does not challenge the sufficiency of the evidence supporting her conviction.

and March 12, 2019,[8] to which Lauvao filed a joinder.  The Circuit Court also heard Samoa's Second Motion to Sever Defendants filed during trial on June 18, 2019, with Lauvao's Joinder to the motion.  The Circuit Court denied the motions to sever in a June 18, 2019 "Order Denying 1) Defendant Wesley Samoa's Second Motion to Sever Defendants, filed June 18, 2019 and 2) Defendant Lama Lauvao's Joinder in Defendant Samoa's Second Motion to Sever Defendants, filed June 18, 2019" (**Order Denying Second Motion to Sever**), which stated in pertinent part:

> The Court finds that the Defendants have not met their burden with respect to their request for severance under State v. Timas, 82 Hawaiʻi 499, 923 P.2d 916 (1996). Defendants have failed to articulate and show any irreconcilable defenses, any preclusions to and/or admission of any damaging evidentiary items in a joint trial, and any prejudice in this case, as such, severance is not warranted.

### B.    Motion in Limine, Rehabilitation Video

Following jury selection on June 12-13, 2019, trial was held from June 18-21, 2019, and June 25, 2019, when the jury reached its verdict.  Prior to commencing trial, the Circuit Court held a hearing on Motions in Limine.  Lauvao's Sixth Motion in Limine - Re: Videos of CW Post Incident, argued that the Rehabilitation Video was inadmissible under Hawaiʻi Rules of Evidence (**HRE**) Rule 403.[9]  The video consisted of footage of Kanui receiving treatment at a rehabilitation hospital in Colorado.  The Circuit Court did not rule on Lauvao's Motion in Limine regarding the admission of the Rehabilitation Video, nor did the Circuit Court indicate on the record that it had reviewed the video before issuing its ruling on the defense objections during trial.

---

[8]    While the March 12, 2019 Motion to Sever was heard and disposed of by the Circuit Court, there is no record of the January 22, 2019 Motion to Sever being heard or disposed of by the Circuit Court.

[9]    HRE Rule 403 states in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

### C.    Trial Testimony

**Testimony of Officer Len Hamakado**

Hawaiʻi County Police Department (**HCPD**) Officer Hamakado testified that he responded to the Kona Seaside shortly after midnight on September 17, 2018.  When he arrived on scene, Kanui was on the ground and other people were in handcuffs.  Other officers who had arrived previously asked Officer Hamakado to look for "video surveillance or a witness."  Officer Hamakado accessed the hotel surveillance system to download a digital video recording from the camera that was facing the front of the hotel, which was the Incident Video, State's Exhibit 13a.  The hotel's surveillance video did not record audio.  The Incident Video contained footage of the incident and was published to the jury.

The following relevant events are depicted in the 25-minute-long Incident Video with necessary additional details clarified by trial testimony regarding the video:  After Samoa's sport utility vehicle (**SUV**) pulls up to the driveway fronting the hotel lobby, Kanui drives up in his security cart.  Kanui gets out of his cart and has a verbal exchange with Samoa, as Lauvao approaches.  Samoa is wearing a tank top, and Lauvao is wearing a backpack.  Mahealani Kanehailua (**Kanehailua**), Samoa's girlfriend, uses her phone to take a video of Kanui.[10]  Kanui returns to his cart, makes a U-turn, and parks his cart facing the SUV.  Tautalatasi approaches, starts arguing with Kanui and becomes increasingly agitated and animated.  Lauvao tries to hold Tautalatasi back from Kanui, but she pushes him away.  Kanehailua walks away to report Kanui to the hotel front desk staff.  Lauvao pulls Tautalatasi, but she pushes his arm away and continues arguing with Kanui, pointing her finger in Kanui's face.  Kanui stands up and starts arguing with Samoa.  Tautalatasi throws her plate of food in Kanui's face.  Kanui pulls Tautalatasi into the cart toward him, grabs Tautalatasi by the hair, and yanks her

---

[10]    HCPD recovered the cell phone during its investigation, but an analysis of the phone determined that no video was recorded during the incident.

head back and forth.  Samoa pushes Lauvao out of the way and steps in between Kanui and Tautalatasi.  Tautalatasi falls backwards out of the cart onto the ground and appears to hit the back of her head.  As Kanui exits the cart, Samoa attempts to punch Kanui, who falls on his side on the ground in the front of the cart.  Samoa hits Kanui.  Tautalatasi comes up from behind Lauvao, kicks Kanui in the back of his head, and pushes Lauvao forward.  Samoa and Tautalatasi punch Kanui in the head as Lauvao and Samoa stomp on Kanui with their feet.  Kanehailua returns to the scene and pushes Samoa away.  Lauvao punches Kanui in the head.  Kanui, still on the ground, sweeps Tautalatasi's legs out with his legs.  Tautalatasi kicks Kanui, who trips her with his legs.  Lauvao punches Kanui in the head again.  Samoa walks over, pulls Kanui away from Tautalatasi, and strikes Kanui in the head. Tautalatasi holds down Kanui's legs on the ground with her hands. Lauvao kicks Kanui's face and Kanui stops moving.  Lauvao leans over Kanui, takes his hand and talks to him.  Kanehailua moves the SUV to Kanui's cart as Tautalatasi and Lauvao begin picking up items from the ground.  Kanui starts moving and Tautalatasi kicks his face as Lauvao watches.  Kanehailua pulls Tautalatasi off of an unresponsive Kanui.  Tautalatasi points to her head, apparently indicating an injury to her forehead.[11]

Officer Hamakado also testified to the events shown on the video after the confrontation, such as the arrival of police officers, the police officers' initial investigation, and the identity of the officers and the medic who initially examined Kanui.

### Physicians' testimony

The Kona Community Hospital emergency room physician who treated Kanui on the day of the incident assessed that Kanui was in critical condition.  Kanui had a breathing tube in his

---

[11]     HCPD Officer Matthew Taira testified that when he questioned Tautalatasi at the scene, he observed that Tautalatasi had "two small contusions or bruises that were on her forehead."  HCPD Officer Leonard Warren testified that he observed a medium-sized lump above Tautalatasi's eyes and that Tautalatasi "knew what she was saying and doing" and "appeared to be too upset to be in pain."

mouth, wore a neck collar, and was unresponsive.  Kanui had swelling around the eye area of the left side of his face and a bloody nose.  A CAT scan revealed that Kanui had blood pooling on the right side of his brain, a bone fracture near his left eye, a broken displaced neck bone, and a spinal cord injury.  Kanui's neck injuries were consistent with "a significant impact" such as "blunt force trauma" from "a fist" or "a kick."  Kanui was then transferred to Queen's Medical Center (**QMC**) to be treated by a trauma surgeon.

The QMC surgeon who examined and treated Kanui testified that her observation upon first examining Kanui was that he was at risk of death due to his severe spinal cord injury.  Kanui was paralyzed and could only move his biceps; he could not move his fingers or legs.[12]

The QMC neurologist who treated Kanui testified that Kanui had a fracture and dislocation of the cervical spine, an injury which would result in paralysis and a loss of function below the biceps.  Kanui's injuries resulted in permanent

---

[12]     The QMC surgeon testified as to Kanui's paralysis:

[PROSECUTOR].  Was he paralyzed?

[QMC SURGEON].  Yes.

[PROSECUTOR].  On the 23rd?

[QMC SURGEON].  Yes.  He was able to only move his biceps.

[PROSECUTOR].  And so anything below the bicep he was not able to move?

[QMC SURGEON].  Correct.

[PROSECUTOR].  Fingers?

[QMC SURGEON].  No.

[PROSECUTOR].  Legs?

[QMC SURGEON].  No.  He could not move his fingers and could not move his legs.

[PROSECUTOR].  Did you -- when you were observing him from the 17th to the 23rd did he make any improvements in his ability to move?

[QMC SURGEON].  Not that I could see.  No.

quadriplegia and loss of Kanui's ability to breathe on his own.[13]

---

[13]    The QMC neurologist testified as to Kanui's injuries:

[PROSECUTOR].  And when you were treating Mr. Kanui were you able to make any determination about his -- whether or not he had a spinal cord injury?

[QMC NEUROLOGIST].  Yes.

[PROSECUTOR].  And did he have a spinal cord injury?

[QMC NEUROLOGIST].  He did have a spinal cord injury.

[PROSECUTOR].  And did that result in him being a quadriplegic?

[QMC NEUROLOGIST].  Yes, it did.

[PROSECUTOR].  And did it result in him having trouble breathing?

[QMC NEUROLOGIST].  Yes, it did.

[PROSECUTOR].  How so?

[QMC NEUROLOGIST].  The upper cervical spine controls movement of the diaphragm as well as movement of the chest wall muscles.  And so it's required for someone to take deep breaths and to cough and clear secretions out of the lungs.  And so an injury at that level causes loss of breathing control.  And requires life support or a ventilator machine to breathe for the person.

[PROSECUTOR].  And a person like Mr. Kanui who is suffering this kind of injury and is quadriplegic, does that get better?

[QMC NEUROLOGIST].  It can get better.  There are patients -- there are people who get better.  Depends on how severe the injury is.

[PROSECUTOR].  In your experience as a neurologist does the typical patient you've met who's a quadriplegic get better?

[QMC NEUROLOGIST].  Not if it's a complete injury.

[PROSECUTOR].  And did Mr. Kanui have a complete injury?

[QMC NEUROLOGIST].  Yes, he did.

[PROSECUTOR].  So that quadriplegic state would be permanent in those cases?

[QMC NEUROLOGIST].  Yes.  Yes.

. . . .

[PROSECUTOR].  Was there any injury internally to Mr. Kanui that you observed other than the spinal injury?  The neck injury?

(continued...)

Kanui's spinal fracture caused injuries to the vertebral arteries that supplied blood to the brain stem, leading to permanent brain injury and loss of motor and sensory function. Kanui was at risk

_____

[13](...continued)
> [QMC NEUROLOGIST]. Because of the spine -- because of the dislocation around the spinal fracture, he had injury to the vertebral arteries which are the blood vessels that supply blood to the brain stem and flow through the neck. And so he had an injury and blockage of both of those blood vessels. Both vertebral arteries.
>
> [PROSECUTOR]. And in your analysis that was caused by the spinal neck injury?
>
> [QMC NEUROLOGIST]. Correct.
>
> [PROSECUTOR]. And what does that mean for -- what did that mean for Mr. Kanui having that blockage on the -- you called it the vertebral arteries?
>
> [QMC NEUROLOGIST]. That's right.
>
> [PROSECUTOR]. What did that mean for Mr. Kanui?
>
> [QMC NEUROLOGIST]. It caused -- it caused some strokes which is a permanent injury to the brain in the right side of the cerebellum.
>
> [PROSECUTOR]. So in your treatment of Mr. Kanui you determined he had permanent brain injury caused by this blockage in the vertebral artery?
>
> [QMC NEUROLOGIST]. Correct.
>
> [PROSECUTOR]. And what -- where was that brain injury at in Mr. Kanui?
>
> [QMC NEUROLOGIST]. It was in the right hemisphere of the cerebellum, which is the balancing coordination center of the brain. It's in the back part of the brain around the brain stem.
>
> [PROSECUTOR]. And would that ever get better in your opinion?
>
> [QMC NEUROLOGIST]. No. No.
>
> . . . .
>
> [PROSECUTOR]. And in your treatment of Mr. Kanui over the time period you treated him, did his condition improve or deteriorate? What happened with him?
>
> [QMC NEUROLOGIST]. Ah, his neurological condition did not improve. It remained stable.
>
> [PROSECUTOR]. And stable meaning?
>
> [QMC NEUROLOGIST]. There was no recovery of motor or sensory function and no recovery of his ability to breathe on his own.

of death when the neurologist initially examined him on the day of the incident, September 17, 2018, and was still at risk of death from his injuries when the neurologist last examined Kanui on September 23, 2018.

> **Rehabilitation Video and testimony of Jennifer Farrell**

The State called Kanui's daughter, Jennifer Farrell (**Farrell**), as a witness. Farrell testified to Kanui's transfer for treatment from Queen's Hospital in Honolulu to Craig Hospital in Colorado in October 2018, and the different rehabilitative treatments that Kanui was undergoing.[14]

---

[14] Farrell testified as follows:

[PROSECUTOR]. Now, Miss Farrell, are you familiar with a place called Craig Hospital?

[FARRELL]. Yes.

[PROSECUTOR]. And how are you familiar with it?

[FARRELL]. Um, that's the hospital my dad was transferred to after Queen's and I visited.

[PROSECUTOR]. You visited Craig Hospital?

[FARRELL]. Yes.

[PROSECUTOR]. And when did you visit Craig Hospital?

[FARRELL]. In October and November of last year.

[PROSECUTOR]. And why did you do that?

[FARRELL]. Because my dad was transferred there because it's a specialty hospital that specializes in TBI's and spinal cord injury.

[PROSECUTOR]. Alright. And TBI, your understanding what's a TBI?

[FARRELL]. Traumatic Brain Injury.

[PROSECUTOR]. Alright. Now when you visited Craig Hospital did you actually see your dad?

[FARRELL]. Yes.

[PROSECUTOR]. And in October can you describe what you saw when you saw -- when you went to see your dad?

[FARRELL]. In October my dad was unable to move. He was paralyzed. And he was placed on bed rest. And during my time there we realized -- or the doctors realized that he would need to go in for another spinal cord surgery. And he

(continued...)

[14](...continued)
still had the halo on.

[PROSECUTOR]. Okay. In November when you went to go visit your dad, can you describe what you observed from his condition?

[FARRELL]. So he was still recovering from the surgery. He had to be on bed rest for I believe six weeks with post op. And he had a neck brace on. And he was laying in the -- in the bed and he did get to get up in his mobile wheelchair.

[PROSECUTOR]. When you said your dad got up, did he get up -- did he get up on his own?

[FARRELL]. No. There is a hoist, a special motorized hoist that the nurses and techs use to get him up, sitting up, and then transfer him from the bed to his chair.

[PROSECUTOR]. And when you were visiting your father did you observe the movement of your dad from his hospital bed to the wheelchair?

[FARRELL]. Yes.

[PROSECUTOR]. And how it was done?

[FARRELL]. Yeah.

[PROSECUTOR]. And with respect to your visit with your father did the nurses -- or did you learn how to move your father from the bed to the wheelchair?

[FARRELL]. Yes. It's a long process.

[PROSECUTOR]. I'm sorry?

[FARRELL]. Yes.

[PROSECUTOR]. And how did you learn that that was done?

[FARRELL]. The nurses and techs started showing us how to do that.

[PROSECUTOR]. Okay. And what did you see?

[FARRELL]. Well there's a remote and you have to pull the hoist out from the -- their's was in a cabinet. And there needs to be -- I mean, you can't do it on your own. There has to be three or four different people. And they hooked him up and it basically lifts him off of the bed in a seated position and transfers him to the chair.

[PROSECUTOR]. Alright. Now with respect to other activities that you observed when you were visiting your father at Craig Hospital did you become familiar with something called bicep relaxation?

[FARRELL]. Yes.

[PROSECUTOR]. Okay. And how did you become familiar
(continued...)

Farrell explained that the Rehabilitation Video recorded in December 2018 at Craig Hospital showed Kanui undergoing rehabilitative bicep relaxation technique exercises and being lifted to and from his bed.  Farrell testified to viewing the Rehabilitation Video; that she did not record it and was not present when it was recorded; and that the video depicted procedures that she herself had observed at a different time.  The Rehabilitation Video was admitted over defense objection on multiple grounds, including HRE Rule 403.[15]

_____

[14](...continued)
with this bicep relaxation?

[FARRELL].  Um, his physical therapist or occupation therapist had printouts for us and she also walked us through -- whoever was visiting, walked us through the motions how to relax different muscle groups because he tends to tighten up.

[PROSECUTOR].  And did you observe the process of this bicep relaxation?

[FARRELL].  Yes.

[PROSECUTOR].  Yeah.  Okay.  And with respect to when your dad was in the wheelchair, did you see or observe how your dad moved in the wheelchair?

[FARRELL].  Yeah.

[PROSECUTOR].  Okay.  And what did you see when you were there?

[FARRELL].  He had no control over his extremities.

[PROSECUTOR].  Okay.  The wheelchair that your dad was in did you see it being moved back and forth?

[FARRELL].  Yes.

[PROSECUTOR].  Okay.  What did you see when you were there at Craig Hospital with respect to movement of the chair?

[FARRELL].  Oh, um, well basically actually there's an area in the back where I was taught how to move him back and forth and also tilt him.


[15]     Samoa objected to the Rehabilitation Video on grounds of hearsay, Confrontation Clause violation, and because it was prepared for purposes of litigation; these objections were joined by Lauvao and Tautalatasi.  The Circuit Court ruled that the Rehabilitation Video was nontestimonial, did not violate the Confrontation Clause, and overruled the HRE Rule 403 objection made by all Defendants-Appellants:

[PROSECUTOR]:  Your Honor, I'm publishing State's
(continued...)

The Rehabilitation Video published and played for the jury is one minute, 9 seconds long, and appears to show Kanui in an occupational therapy session with a female employee (**Employee**) of Craig Hospital in Colorado. Kanui is shown sitting in an electric-powered wheelchair with lifting capability, with two straps across Kanui's chest and mid-section. Kanui is wearing a black t-shirt and black exercise shorts, glasses, a neck brace, and compression stockings with athletic shoes. Only Employee's voice is audible in the video, as she instructs Kanui on how to use the chair, and what may or may not work for him as he uses the chair. The video also shows Employee working with Kanui's left arm, and his left hand at the controls of the chair, lifting him up and backwards. At approximately 15 seconds, Employee is shown massaging Kanui's left bicep, and Employee is heard affirming Kanui's efforts, saying, "Good." At 30 seconds, it appears Kanui smiles for a moment and makes an inaudible comment to Employee. Employee instructs Kanui on how to lower the chair. Employee has Kanui lift the chair once more using the hand control. At approximately one minute, after Kanui has lifted the chair to its full height, Employee tells him, "Good," once again.

### Defendants-Appellants' testimony

Lauvao and Tautalatasi testified, and Samoa did not.

Lauvao testified that he and Tautalatasi, his then-fiancee, were vacationing in Kona and staying at the Kona

---

[15](...continued)
   Exhibit 45a.

> [SAMOA'S COUNSEL]: Objection under 403.
>
> [LAUVAO'S COUNSEL]: Join the objection, Your Honor.
>
> [TAUTALATASI'S TRIAL COUNSEL]: Miss Tautalatasi joins the objection.
>
> THE COURT: [Lauvao's Counsel]?
>
> [LAUVAO'S COUNSEL]: Prejudicial to the jury.
>
> THE COURT: No, you join in the objection?
>
> [LAUVAO'S COUNSEL]: Yes. Oh, yes.
>
> THE COURT: Overruled.

Seaside. On September 16, 2018, Lauvao and Tautalatasi went to the beach with Samoa, who is Lauvao's cousin, and Samoa's family. Following the beach, Lauvao and Tautalatasi had dinner at Samoa's parents' house. Lauvao and his family members were drinking alcohol. Lauvao, Tautalatasi, Samoa, and Kanehailua stopped at a karaoke bar before heading to the Kona Seaside at 11:30 to 11:45 p.m. While viewing the video, Lauvao testified to the events depicted. Lauvao testified that during Tautalatasi's and Kanui's dispute, Lauvao tried to get in between them and tried to grab her arm and pull her away to protect her. After Tautalatasi threw her plate of food at Kanui, Kanui fell backwards and pulled Tautalatasi into the cart with him. Lauvao tried to pull Tautalatasi out of the cart but she fell backward onto the ground. Soon after, Lauvao stood in front of Kanui, but Tautalatasi tried to push Lauvao out of the way, causing Lauvao to almost fall onto Kanui. As Tautalatasi was on top of Kanui, who was on the ground, and was hitting him, Lauvao stood and watched. Lauvao then kicked Kanui. Lauvao testified that he was not trying to kill Kanui when he kicked him. When Kanui grabbed Tautalatasi by the hair, Lauvao slapped Kanui's arm to free Tautalatasi from Kanui's grip. Lauvao testified that he removed his backpack and reached out to Kanui, who was still lying on the ground, to try and help Kanui to his feet. Tautalatasi began hitting Kanui and Kanui grabbed her leg and tripped her; Lauvao hit Kanui on the head after he tripped Tautalatasi. Samoa punched Kanui, and Lauvao kicked Kanui at the same time. Lauvao stated that it was not right for him to kick Kanui a second time, but that he was not trying to kill Kanui. Lauvao subsequently grabbed Kanui's arm and checked to see if Kanui was responsive and still breathing. Lauvao testified that he was concerned that Kanui might have been "really, really hurt . . . [b]ecause of what happened." When Tautalatasi began to kick and punch Kanui again, as Kanui was on the ground and not moving, Lauvao grabbed her arm and tried to pull her off of Kanui, but ended up standing there and watching Tautalatasi. Lauvao maintained that neither he nor Samoa or Tautalatasi were trying to kill Kanui. He testified that he recognized that Kanui was a very tall, large

man.  On cross-examination, Lauvao testified that as Tautalatasi was arguing with Kanui, Lauvao was concerned for Tautalatasi's safety.  Lauvao testified that when Samoa was hitting Kanui while Kanui was on the ground, Kanui was, at that moment, not a threat to Lauvao or Tautalatasi.  When he hit Kanui on the head, Lauvao stated that he "stomped" Kanui, and that his "leg raised and came down on [Kanui's] forehead."  Lauvao testified that he was angry and intoxicated at the time of the incident.  On redirect examination, Lauvao testified that everything happened quickly and that none of the events were calculated and planned out.

Tautalatasi testified to feeling sick that day, with chills, sore throat, and a cough.  She drank a few shots of hard alcohol to soothe her sore throat during the dinner at Samoa's house.  On the way back to the hotel, she and Lauvao were arguing about seating arrangements in Samoa's car.  At the time, Tautalatasi was emotional towards Lauvao because she was hurt and was angry towards him.  When they pulled up to the lobby of the Kona Seaside, Samoa was playing loud music from inside his SUV. Tautalatasi, who was "in tears" and "an emotional wreck at the time," exited Samoa's car and saw Lauvao and Samoa talking to Kanui.  Tautalatasi testified that she saw Kanui's cart but did not know that Kanui was hotel security.  She had her plate of food and a jacket in her hands.  Tautalatasi apologized to Kanui for the loud music, to which Kanui replied that Tautalatasi was making noise earlier that day, that he was going to "trespass" them, and that the police were on their way to the hotel. Tautalatasi testified that she said:  "'We apologize for the music. We turned it down. We're just trying to get to our room. We're guests here.'"  According to Tautalatasi, Kanui then said: "'You fucking Samoans always making trouble' or 'You always making trouble or always making noise.'"  Tautalatasi was angry, insulted, and appalled because Kanui "was a security guard and authority figure."  Tautalatasi claimed Kanui was "almost taunting" when he said, "'[t]he cops are coming and you guys are going to jail.'"  Tautalatasi then threw her plate of food at Kanui.  Tautalatasi testified that Kanui grabbed Tautalatasi and pulled her into the cart.  Tautalatasi felt an object, such as a

16

walkie-talkie or a flashlight, hit her on the side of her head, right above her temple. She did not see what she was hit with and did not remember hitting her head on the golf cart, but heard a "crack," saw "black spots," and may have "blacked out little bit." She testified that she did not know that, while she was in the golf cart with Kanui, Lauvao and Samoa were standing near her. Her next memory was lying on the ground and Lauvao trying to pick her up, but that she did not want his help. Tautalatasi testified that she did not remember the rest of what happened, and probably remembered only "25 to 30 percent of the night." Her memory was very hazy and she remembered bits and pieces after watching the video.

Regarding the video, Tautalatasi testified that she had seen the Incident Video "one time back in September [of 2018] briefly" and that she had seen the video "earlier [that] week." During cross-examination, Tautalatasi testified that while she saw herself in the video kick Kanui twice in the head, including once in the face, she did not remember kicking Kanui. Tautalatasi acknowledged that, in the video, when Samoa was punching Kanui in the head, Tautalatasi's hands were holding down Kanui's legs. After Kanui was lying on the ground, motionless, Tautalatasi kicked Kanui in the face, causing Kanui's body to move backward forcefully. When Lauvao and Kanehailua tried to pull her away from Kanui, she continued hitting Kanui's head and upper body approximately fifteen to sixteen times. Tautalatasi stated that while Lauvao moved one of her arms from Kanui, it was was Kanehailua who pulled Tautalatasi off of Kanui. As Kanui laid on the ground, Lauvao leaned over him and said, "'We were guests here. We told you we were guests here.'" Tautalatasi testified that she did not intend to kill, or even assault, Kanui. She testified that she should have walked away.

### D.  Verdict

As to each Defendant-Appellant, the Circuit Court instructed on Attempted Murder Second and the following included offenses:  Attempted Manslaughter Based on Extreme Mental or Emotional Disturbance; Assault First; Assault in the Second

Degree (intentionally or knowingly); Assault in the Second Degree (reckless); Reckless Endangering in the Second Degree; Assault in the Third Degree; and Assault in the Third Degree - Mutual Affray. The jury found Lauvao guilty of the included offense of Assault First, and found Tautalatasi and Samoa guilty as charged of Attempted Murder Second.

Following sentencing on September 13, 2019, Defendants-Appellants timely appealed.

## II. STANDARDS OF REVIEW

### Motion to Sever

An appellate court "reviews the denial of a motion for severance for an abuse of discretion." State v. Walton, 133 Hawaiʻi 66, 82, 324 P.3d 876, 892 (2014) (citations omitted).

### Admissibility of Evidence

A trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion. When such an abuse of discretion is identified, it is grounds to vacate a conviction unless it is harmless beyond a reasonable doubt.

State v. Feliciano, 149 Hawaiʻi 365, 372, 489 P.3d 1277, 1284 (2021) (citations and brackets omitted).

### Sufficiency of the Evidence

The standard of review for sufficiency of the evidence is well established; namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

State v. Bowman, 137 Hawaiʻi 398, 405, 375 P.3d 177, 184 (2016) (quoting State v. Grace, 107 Hawaiʻi 133, 139, 111 P.3d 28, 34 (App. 2005)(internal citations omitted)).

### III.  DISCUSSION[16]

#### A.  The Circuit Court did not abuse its discretion in denying Samoa's motions to sever

Samoa contends that the Circuit Court abused its discretion in denying his motions to sever.  Samoa asserts that he was significantly prejudiced by having a joint trial with Tautalatasi because Tautalatasi, who was "significantly more culpable," engaged in more serious and violent behavior that "evidenced her intent to inflict death or serious bodily injury," whereas Samoa only used measured force to protect Tautalatasi.  Samoa claims that the consolidation of proceedings allowed the State to attribute Tautalatasi's more serious actions to Samoa via accomplice liability.  Per Samoa, his defense-of-others defense "was significantly compromised because of Tautalatasi's excessive use of force outside of the instances where Samoa was justified in using force for her protection."

Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 8(b)(3)[17] permits joinder of multiple defendants for a joint trial where the charged offenses are "closely connected" such that "it would be difficult to separate proof of one charge from proof of the others."  If, however, a defendant or the State is "prejudiced by a joinder[,] . . . the court may order an election or separate

---

[16]    We have reordered, restated, and consolidated Defendants-Appellants' points of error for clarity.

[17]    HRPP Rule 8(b)(3) provides for joinder of defendants:

(3) when, even if conspiracy is not charged and all of the defendants are not charged in each count, the several offenses charged:

   (i) were part of a common scheme or plan; or

   (ii) were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others.

trials of counts, grant a severance of defendants or provide whatever other relief justice requires."  HRPP Rule 14.

> In deciding a motion for severance, the trial court must balance possible prejudice to the defendant from joinder with the public interest in efficient use of judicial time through joint trial of defendants and offenses which are connected.  An appellate court may not conclude that the defendant suffered prejudice from a joint trial unless it first concludes that a defendant was denied a fair trial. What might have happened had the motion for severance been granted is irrelevant speculation.

Walton, 133 Hawaiʻi at 82-83, 324 P.3d at 892-93 (quotation marks and internal citations omitted).  The burden is on the defendant to prove that the defendant was denied a fair trial.  Id. at 84, 324 P.3d at 894 (citing State v. Timas, 82 Hawaiʻi 499, 512, 923 P.2d 916, 928 (App. 1996)).  While there is no "test or exclusive list of prejudices," a joint trial may be unfair to one defendant when:

> (1) the core of each defense is in irreconcilable conflict with the other, (2) the defendant in question is prevented from introducing evidence that would have been admissible in that defendant's separate trial not involving other defendants, or (3) evidence damaging to the defendant in question is admitted and it would not have been admissible in that defendant's separate trial not involving other defendants."

Id. (citing State v. Gaspar, 8 Haw. App. 317, 327, 801 P.2d 30, 35 (1990) (other citations omitted)).  Defendants are not entitled to severance based on inconsistent defenses or because "they may have a better chance of acquittal in separate trials." Zafiro v. United States, 506 U.S. 534, 540 (1993).  To establish an abuse of discretion, the defendant "must demonstrate that clear and manifest prejudice did occur."  Walton, 133 Hawaiʻi at 85, 324 P.3d at 895 (quoting United States v. Tootick, 952 F.2d 1078, 1083 (9th Cir. 1991)).

Here, Samoa has not pointed to any specific basis for severance, such as irreconcilable defenses, prejudicial admission of evidence, or other examples of prejudice from a joint trial with Tautalatasi.  See Walton, 133 Hawaiʻi at 84, 324 P.3d at 894.  Samoa's own argument -- that his "primary defense" was that he was defending Tautalatasi from Kanui and that Tautalatasi used

20

"excessive" force -- underscores the interconnectedness of the offenses and the defenses, which militates in favor of a joint trial.  Samoa's assertions that Tautalatasi was more culpable and that the joint trial with Tautalatasi prejudiced him, are akin to claiming that he "ha[d] a better chance of acquittal" in a separate trial, and is not a proper basis for severance.  Zafiro, 506 U.S. at 540.  Samoa's arguments do not demonstrate "clear and manifest prejudice" establishing an abuse of discretion in the denial of the motions to sever.  See Walton, 133 Hawaiʻi at 85, 324 P.3d at 895.

### B.    The Circuit Court erred in admitting Exhibit 45A, the Rehabilitation Video

Defendants-Appellants contend that the Circuit Court erred in admitting the Rehabilitation Video, Exhibit 45a. Tautalatasi specifically contends that the Circuit Court erred by not performing an on-the-record review[18] of the Rehabilitation Video and by admitting the video in violation of HRE Rule 403. Lauvao and Samoa contend that the Rehabilitation Video and Farrell's testimony[19] should have been excluded as irrelevant under HRE Rule 402 and unduly prejudicial under HRE Rule 403.[20] Tautalatasi's brief also includes argument based on HRE Rule 403.

---

[18]    Tautalatasi's point of error does not indicate where in the record the alleged error of the lack of on-the-record review was objected to or brought to the Circuit Court's attention pursuant to HRAP Rule 28(b)(4)(iii) and (4)(A); this error is waived.  See HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded . . . .").

[19]    Both Lauvao and Samoa do not identify where in the record they objected to Farrell's testimony.  See HRAP Rule 28(b)(4)(iii) and (4)(A).  No specific objection to Farrell's testimony appears in the record.  The contentions regarding the admission of Farrell's testimony are waived.  See HRE Rule 103(a)(1); State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal . . . . ").

[20]    Lauvao does not identify in this point of error where in the record the alleged error based on HRE Rule 403 occurred and where the error was objected to or preserved, pursuant to HRAP Rule 28(b)(4)(ii) and (iii). However, as this required information missing from the point of error section appears in Lauvao's argument, we consider his point of error.  See Marvin v. Pflueger, 127 Hawaiʻi 490, 496, 280 P.3d 88, 94 (2012) (internal citations, quotation marks, brackets, ellipses omitted) ("[N]oncompliance with Rule 28 does not always result in dismissal of the claims, and this court has consistently adhered to the policy of affording litigants the opportunity to have their cases heard on the merits, where possible.  This is particularly so where the remaining sections of the brief provide the necessary information to identify the party's argument.").

Samoa argues that the evidence of Kanui's physical condition three months after the incident should have been excluded as irrelevant because "the fact that Kanui was still paralyzed three months after the incident had no bearing on whether the defendants, at the time of the incident, intended to cause his death."  Citing State v. Pinero, 70 Haw. 509, 518, 778 P.2d 704, 711 (1989), Samoa asserts that the Rehabilitation Video was "highly prejudicial and likely to 'rouse the jury to overmastering hostility,'" especially with testimony of Farrell. Lauvao asserts that there was sufficient testimony by doctors regarding Kanui's injuries and the video was thus unnecessary.

In response to Defendants-Appellants' HRE Rule 403 arguments, the State argues that the Rehabilitation Video addressed "a fact of consequence to the case, namely the degree and extent of Mr. Kanui's injuries, which also spoke indirectly to the intent of the Defendants."  The State claims the video also corroborated the medical experts' initial diagnosis and prognosis of Kanui's injuries.  The State claims that the video "was not gruesome or revolting and did not overly prejudice" Defendants-Appellants "any more than the medical testimony or Exhibit 13A [(the Incident Video)]."  The State also noted that Lauvao was convicted of the lesser offense of Assault First, for which an element of proof was "serious bodily injury[.]"[21]  The State argues that the "serious bodily injury" element "meant the State had to show 'serious, permanent disfigurement, or protracted loss or impairment' of a bodily member or organ" -- and thus, the video was "crucial, relevant, probative evidence to that effect."

Under HRE Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . or by considerations of . . . waste of time, or needless presentation of cumulative evidence."  The

---

[21]     HRS § 707-710(1)(2014), "Assault in the first degree," provides that:  "A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."  "'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of function of any bodily member or organ."  HRS § 707-700 (2014).

commentary to HRE Rule 403 recognizes that "[u]nfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Gallagher, 146 Hawaiʻi 462, 481, 463 P.3d 1119, 1138 (2020) (internal quotation marks and citations omitted). The commentary to HRE Rule 403 recognizes the "potential for engendering juror prejudice, hostility, or sympathy" as a factor in HRE Rule 403 determinations. State v. Riveira, 149 Hawaiʻi 427, 432, 494 P.3d 1160, 1165 (2021).[22] In "weighing probative value versus prejudicial effect, a variety of matters must be considered, including the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." State v. Edwards, 81 Hawaiʻi 293, 297-98, 916 P.2d 703, 707-78 (1996) (brackets, ellipses and citations omitted)).[23]

Here, the Rehabilitation Video's probative value was minimal in light of the evidence the State had already presented. The medical experts had testified regarding the degree, nature, prognosis, and permanence of Kanui's injuries. While the video

---

[22] In Riveira, the supreme court held that a burglary victim's impact testimony on the crime's impact on the victim and her family had "great potential to unfairly prejudice Riveira" and was inadmissible under HRE Rule 403 because the "evidence generated sympathy for the family and impelled hostility" to Riveira. Id. at 432; 494 P.3d at 1165. In reviewing the claim for prosecutorial misconduct raised in that case, the court concluded that although the misconduct was serious, it was nevertheless harmless beyond a reasonable doubt where the misconduct "had no reasonable possibility of contributing to [Riverira's] conviction" where the record contained "overwhelming evidence" establishing Riveira's guilt. Id. The Riveira court explained: "[v]ictim impact evidence concerns a crime's effect on the person harmed by the crime or others," and "includes evidence regarding the physical, psychological, or economical effect of a crime." Id. at 434, 494 P.3d at 1167 (citation omitted). The court cautioned that "after-effects" of a crime are "rarely allowed" during a trial because it is "generally irrelevant to a defendant's guilt[.]" Id. at 431, 494 P.3d at 1164 (citing HRE Rules 401, 403).

[23] In Edwards, the evidence at issue were twenty-five photographs "depicting the dead and mutilated body of the decedent" during a trial in which the defendant was convicted of murder in the second degree, sexual assault in the first degree, and other charges. 81 Hawaiʻi at 296, 916 P.2d at 706 (brackets omitted). The Edwards court determined that the photographs, which were admitted to corroborate testimony related to the defendant's charges, were not unfairly prejudicial to the defendant under HRE Rule 403 because each photograph, while gruesome, depicted different injuries inflicted on the decedent that were not visible in the other photographs, and demonstrated the severity of the injuries. Id. at 299-300, 916 P.2d at 709-10.

reflected Kanui's condition three months after the incident and was probative of "protracted loss or impairment" of Kanui's bodily function for the purpose of establishing "serious bodily injury," there was no need for this evidence where the permanence of Kanui's injuries had been established through the medical experts.  Before the video was published to the jury, Farrell had already testified to her observations of her father's continued state of  paralysis in October and November, when she visited him at Craig Hospital in Colorado, a specialty hospital that specialized in traumatic brain injuries and spinal cord injuries. Farrell described learning how to use the "special motorized hoist" that was depicted in the video, to lift Kanui off of a bed to transfer him to a chair, and how to move and tilt Kanui's wheelchair because Kanui "had no control over his extremities." Thus, the record shows that in light of the "alternative proof" available to the State though the testimony of the medical experts and Farrell, the need for the Rehabilitation Video was slight.  Id. at 297, 916 P.2d at 707.

Balanced against the marginal probative value of the Rehabilitation Video, the potential of unfair prejudice caused by the unnecessary, cumulative admission of the video was substantial.  See HRE Rule 403.  In our view, the graphic nature of Kanui's disability depicted in the video would create an "undue tendency to suggest decision on an improper basis" due to the emotional and sympathetic response the video would evoke in an average viewer.  Gallagher, 146 Hawaiʻi at 481, 463 P.3d at 1138.  Thus, we conclude that the Circuit Court abused its discretion by allowing the State to admit the Rehabilitation Video; and given the impactful nature of the video, we cannot conclude that this error was harmless beyond a reasonable doubt. See Feliciano, 149 Hawaiʻi at 372, 489 P.3d at 1284.

> **C.   Sufficient evidence supports the convictions**
> **1.   Lauvao's sufficiency of evidence claim**

Lauvao contends that there was not substantial evidence to support his conviction where the State failed to prove that he did not act in defense of Tautalatasi.  Lauvao argues that the

evidence of the Incident Video, testimony of HCPD Officer Shawn Mirafuentes (**Officer Mirafuentes**),[24] and Lauvao's own testimony showed that Lauvao's actions were in response to the defense of Tautalatasi.

Under the defense of others justification, HRS § 703-305,[25] "the trier of fact must determine whether, from the objective point of view of a reasonable person, the defendant's use of force was necessary for the protection of a person who would be justified in using such force, under the circumstances as the defendant subjectively believes them to be." State v. Pavao, 81 Hawaiʻi 142, 145, 913 P.2d 553, 556 (App. 1996). "Once evidence of justification has been adduced, the prosecution has the burden of disproving it beyond a reasonable doubt." State v. Matuu, 144 Hawaiʻi 510, 520, 445 P.3d 91, 101 (2019) (citing State v. Culkin, 97 Hawaiʻi 206, 215, 35 P.3d 233, 242 (2001)). A defendant's state of mind can be read from "acts, conduct and inferences fairly drawn from all the circumstances." State v. Birdsall, 88 Hawaiʻi 1, 8, 960 P.2d 729, 736 (1998) (citation omitted).

Here, the record reflects substantial evidence to support a jury's rejection of Lauvao's defense of others justification. See HRS § 703-305; Matuu, 144 Hawaiʻi at 521-22, 445 P.3d at 102-103; Pavao, 81 Hawaiʻi at 145, 913 P.2d at 556. Lauvao testified that during Tautalatasi's verbal argument with Kanui, Lauvao tried to get in between them and pull Tautalatasi

___

[24]    Officer Mirafuentes, one of the responding officers, was asked on cross-examination whether Lauvao expressed any concern for his wife; and the officer testified that when Lauvao was detained, he said, "'Don't touch -- he touch -- he touch my wife.  He touch my wife.'"

[25]    HRS § 703-305(1) (2014), entitled "Use of force for the protection of other persons," provides in pertinent part:

>     (1) Subject to the provisions of this section and of section 703-310, the use of force upon or toward the person of another is justifiable to protect a third person when:

>     (a) Under the circumstances as the actor believes them to be, the person whom the actor seeks to protect would be justified in using such protective force; and

>     (b) The actor believes that the actor's intervention is necessary for the protection of the other person.

away, but she ignored him. Lauvao testified that as he stood over Kanui, who was lying on the ground, Tautalatasi tried to push Lauvao out of the way to get to Kanui. As Tautalatasi hit Kanui repeatedly, Lauvao tried to pull her off, but when she resisted, he stood to the side and watched. Lauvao testified that he did not believe Kanui to be a threat to Tautalatasi or to himself. Based on Lauvao's own testimony and Lauvao's actions depicted in the video, the jury was within its province to conclude that Lauvao did not believe that Tautalatasi was justified in using force to protect herself, or that Lauvao's intervention was necessary for Tautalatasi's protection. See Matuu, 144 Hawaiʻi at 521-22, 445 P.3d at 102-103; Pavao, 81 Hawaiʻi at 145, 913 P.2d at 556. Thus, viewing the properly admitted evidence in the light most favorable to the State, there was substantial evidence to support the jury's rejection of Lauvao's defense of others justification and to convict Lauvao of Assault First. See Bowman, 137 Hawaiʻi at 405, 375 P.3d at 184; State v. Wallace, 80 Hawaiʻi 382, 413-15, 910 P.2d 695, 726-28 (1996).

### 2. Samoa's sufficiency of evidence claims

Samoa contends that there was not substantial evidence of attempt or accomplice liability, because the "undisputed, objective video evidence confirms that Samoa, [sic] (1) did not attempt to cause Kanui's death, and/or (2) that he was not [sic] accomplice to Tautalatasi and Lauvao." Samoa argues that the Incident Video does not support a finding that Samoa attempted to cause Kanui's death because Samoa only used force against Kanui on two occasions when he intervened between Tautalatasi and Kanui. According to Samoa, the first occasion was when Samoa hit Kanui once in the face and "brought his foot up and then down possibly hitting Kanui's face" when Kanui grabbed Tautalatasi's hair after Tautalatasi threw her plate of food at Kanui, and the second occasion was when Samoa hit Kanui four times in the face after Kanui swept Tautalatasi's legs and caused her to fall. Samoa claims that he only used measured force to stop Kanui from

assaulting Tautalatasi and that he stopped using force after those two incidents.

To prove that Samoa attempted to cause Kanui's death under HRS § 705-500,[26] the State was required to establish beyond a reasonable doubt that Samoa intentionally engaged in conduct which, under the circumstances that Samoa believed them to be, constituted a substantial step in a course of conduct intended or known by Samoa to cause the death of Kanui. See HRS §§ 705-500 and 707-701.5; Walton, 133 Hawaiʻi at 82, 324 P.3d at 892. For accomplice liability under HRS § 702–222[27] "a person must act with the intent of promoting or facilitating the commission of the crime," State v. Soares, 72 Haw. 278, 282, 815 P.2d 428, 430 (1991) (italics omitted), and "[m]ere presence at the scene of an

---

[26]    HRS § 705-500 (2014) defines "Criminal attempt" as follows,

(1) A person is guilty of an attempt to commit a crime if the person:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

[27]    HRS § 702-222 (2014), entitled "Liability for conduct of another; complicity," provides in pertinent part that,

[a] person is an accomplice of another person in the commission of an offense if:

(1) With the intention of promoting or facilitating the commission of the offense, the person:

(a) Solicits the other person to commit it;

(b) Aids or agrees or attempts to aid the other person in planning or committing it . . . .

27

offense, or knowledge that an offense is being committed, without more, does not make a person an accomplice to that offense." State v. Acker, 133 Hawaiʻi 253, 286, 327 P.3d 931, 964 (2014) (quoting HAWJIC 6.01). To disprove the defense of others justification, the factfinder must apply HRS § 703-305 and assess the subjective and objective prongs as set forth supra, in Pavao, 81 Hawaiʻi at 145, 913 P.2d at 556.

Here, viewed in the light most favorable to the State, the record of the Incident Video reflects substantial evidence to support the requisite intent for Attempted Murder Second, accomplice liability, and the jury's rejection of the defense of others justification. See Bowman, 137 Hawaiʻi at 405, 375 P.3d at 184. The Incident Video shows that Samoa stood beside the cart and then inserted himself into the fight once Tautalatasi and Kanui started physically fighting in the cart. Samoa tried to hit Kanui, but missed as Kanui tried to leave his security cart, and then Samoa punched and kicked Kanui, who was on the ground and was not in contact with Tautalatasi. While Kanui was on the ground, there were multiple instances in which Samoa punched and kicked Kanui in the head while Tautalatasi simultaneously hit Kanui. After Kanehailua pulled Samoa away and Tautalatasi fell, Samoa re-entered the fight to hit Kanui again. Samoa also pulled Kanui away and struck Kanui on the head as Tautalatasi held down Kanui's legs. The treating physicians established that Kanui's injuries included a bone fracture near his eye, a broken neck bone, a spinal cord injury, and paralysis; this evidence juxtaposed with the number of punches and kicks by Samoa on the video was substantial evidence for the jury to reasonably infer Samoa's intent to commit Attempted Murder Second, that Samoa acted as an accomplice, and to support the jury's rejection of the defense of others justification. Viewing the properly admitted evidence in the light most favorable to the State, there was substantial evidence to support Samoa's conviction for Attempted Murder in the Second Degree. See id.; Wallace, 80 Hawaiʻi at 413-15, 910 P.2d at 726-28.

### D.    Remaining points of error

Because we vacate and remand for a new trial for the reason set forth above, we do not reach Defendants-Appellants' remaining contentions.

## IV. CONCLUSION

For the foregoing reasons, we vacate the September 13, 2019 Judgment of Conviction and Sentence entered by the Circuit Court of the Third Circuit, as to all Defendants-Appellants, and remand for a new trial consistent with this Memorandum Opinion.

DATED:   Honolulu, Hawaiʻi, September 9, 2022.

On the briefs:

Andrew M. Kennedy,
(Schlueter, Kwiat & Kennedy
LLLP),
for Defendant-Appellant
Lama Lauvao.

Victor M. Cox,
(Victor M. Cox Attorney at
Law),
for Defendant-Appellant
Natisha Tautalatasi.

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant
Wesley Samoa.

Charles E. Murray III,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Karen T. Nakasone
Associate Judge